**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:07cv191**


| | |
|---|---|
| **FRANCES W. HAYDEN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | <u>**MEMORANDUM OF**</u> |
| ————————————————— ) | <u>**DECISION AND ORDER**</u> |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| ————————————————— ) | |


**THIS MATTER** is before the Court on the Plaintiff's Motion for

Summary Judgment [Doc. 11], filed October 8, 2007, and the Defendant's

Motion for Summary Judgment [Doc. 13], filed December 5, 2007.

## PROCEDURAL HISTORY

The Plaintiff filed her application for social security disability benefits

on December 24, 2002 alleging the onset of disability as of May 15, 2002.

[Tr. 15].  Her claim was denied initially and on reconsideration, resulting in

the Plaintiff's request for a hearing which was held on July 25, 2006. [Id.].

On August 24, 2006, Saul Nathanson, Administrative Law Judge issued his decision finding that the Plaintiff was not disabled as defined in the Social Security Act.  [Tr. 15-21].

The Plaintiff requested review of the decision by the Social Security Appeals Council on August 28, 2006. [Tr. 11-12].  The Appeals Council denied the request for review on March 30, 2007. [Tr. 5-7].  On May 4, 2007, the Plaintiff timely filed her Complaint in this Court seeking review of that determination. [Doc. 1].

## STANDARD OF REVIEW

This Court does not conduct a *de novo* review of the decision of the Administrative Law Judge (ALJ) denying Social Security benefits to the Plaintiff.  In fact, under the statutory scheme of the Social Security Act, the reviewing court "must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard."  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (*superseded by statute on other grounds*); 42 U.S.C. §405(g) (2002); Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006) ("Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must

assure that the ultimate conclusions are legally correct.") (citation omitted).
Substantial evidence is defined as that which "a reasonable mind might
accept as adequate to support a conclusion." Craig, 76 F.3d at 589. "It
consists of more than a mere scintilla of evidence but may be somewhat
less than a preponderance." Id.; Shively v. Heckler, 739 F.2d 987, 989
(4th Cir. 1984). "In reviewing for substantial evidence [the court should
not] undertake to re-weigh conflicting evidence, make credibility
determinations, or substitute [its] judgment for that of the Secretary."
Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001), *quoting* Craig, F.3d at
589; Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992), *citing* Hays v.
Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) ("It is not our place either to
weigh the evidence or to substitute our judgment for that of the Secretary if
that decision was supported by substantial evidence."). Thus, the issue for
resolution here "is not whether [Plaintiff] is disabled, but whether the ALJ's
finding that she is not disabled is supported by substantial evidence and
was reached based upon a correct application of the relevant law." Craig,
F.3d at 589.

## THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows

a five-step sequential process. 20 C.F.R. §416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. Id. Second, the applicant must show a severe impairment. If the applicant does not show any impairment or combination thereof which significantly limits the physical or mental ability to perform work activities, then no severe impairment is shown and the applicant is not disabled. Id. Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the applicant is disabled regardless of age, education or work experience. Id. Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. Id. Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other available work. If so, then the

claimant is not disabled.  Id.  In this case, the ALJ's determination was made at the fifth step.


## FACTUAL BACKGROUND

The Plaintiff testified at her hearing about her education and work experience, her symptoms and pain and her ability to perform daily life activities.  At the time of the final ruling, the Plaintiff was forty-seven years old. [Tr. 47].  She graduated from high school and completed two years of college. [Tr. 250].  For approximately nineteen years, the Plaintiff worked in an administrative/secretarial capacity answering telephones, typing, doing computer data entry and scheduling. [Id.].  She last worked in May 2002. [Id.].

The Plaintiff had a worker's compensation case through which she attended vocational rehabilitation. [Tr. 251].  Despite the rehabilitation, she was not able to obtain placement in a job.  [Id.].  At the time of the hearing, the Plaintiff was attending vocational rehabilitation through the North Carolina Department of Health and Human Services. [Tr. 86, 252].  She was attending Central Piedmont Community College where she was taking accounting courses.  [Id.].

The Plaintiff's worker's compensation case stemmed from carpal

tunnel syndrome in both wrists. [Tr. 253]. Prior to surgery on both wrists, she was able to wash her car and mow the grass. [Id.]. She was unable to perform those tasks after the surgery. [Id.]. The primary symptom she experienced was pain twenty-four hours a day. [Tr. 254]. Pain went from her fingers up to just below her shoulders in each arm and she frequently woke up at night with numbness in her fingers. [Id.]. The pain continued to be severe until 2004 when she eliminated many daily activities, including driving and cooking. [Tr. 255].

The Plaintiff's first surgery was in November 1999 and the second one was in June 2000. [Id.]. After each surgery, the Plaintiff had relief and was able to return to work on a light duty assignment. [Id.]. When she was placed back on regular duty, the pain recurred. [Tr. 256]. On a scale of one to ten, she described her pain as a ten until she stopped most activities involving the use of her wrists. [Tr. 257]. At the time of the hearing, her pain was around two and at times, she was pain free. [Id.]. Use of her hands always increased her level of pain. [Tr. 258]. In connection with her school work, the Plaintiff was required to use a computer but she was able to work for fifteen to thirty minutes at a time and then take a break. [Id.]. The Plaintiff estimated that an hour or an hour and a half of computer or keyboard use would cause the pain to

increase. [Tr. 259].  The Plaintiff's past job at Duke Power involved a significant amount of computer and keyboard use and she estimated that performing her past job would result in an increase in pain within fifteen to twenty minutes.  [Id.].

The Plaintiff testified that her physicians have told her the only remedy at this point is the use of pain medication, which she was unable to tolerate due to side effects. [Tr. 260].  She did use lidoderm patches on her arms about once or twice per month.  [Tr. 261].  The Plaintiff also wore arm splints about once every week or two weeks. [Tr. 262].  At the time of the hearing, the Plaintiff had not seen her doctor concerning her wrists for a year because he told her there was nothing more he could do for her.  [Id.].  She described an incident when she drove her mother to the mall, pushed her mother's wheelchair and then drove home.  [Id.].  As a result, she had to put on her splints due to increased pain.  [Id.].

At the time of the hearing, the Plaintiff was able to take short drives of ten to fifteen minutes without increased pain. [Tr. 263].  She was also able to conduct her grocery shopping although most of the time someone went with her. [Tr. 264].  The Plaintiff's son mowed her grass and helped with vacuuming and household chores. [Tr. 265].  She did her laundry about once a month. [Tr. 266].  The Plaintiff was able to attend to her

personal hygiene except for washing her hair. [Id., Tr. 267].

When asked if she could perform past job functions, the Plaintiff testified that any use of her arms on a regular basis caused pain. [Tr. 269]. She also had difficulty opening things. [Id.]. Any repetitive motion resulted in increased pain. [Tr. 273]. At the time of the hearing, the Plaintiff was taking classes for about twelve hours per week and took notes by writing during class. [Tr. 275].

A review of the Plaintiff's medical records showed her first treatment for these symptoms on March 29, 1999 at which time she was thirty-nine years old. [Tr. 98]. She was diagnosed with Raynaud's phenomenon, inflamation of tendon and possible carpal tunnel syndrome. [Id.]. She was placed on Celebrex and told to return if needed. [Id.].

When the Plaintiff returned in June 1999, she reported that the Celebrex had helped until she ran out of the prescription. [Tr. 99]. Her physician noted that "[s]he should avoid repetitive motion at work if at all possible." [Id.]. An injection into the right carpal canal resulted in immediate and total relief for two weeks and about a month later, she began to have some pain. [Tr. 99-100]. The Plaintiff was referred for nerve conduction studies which were normal. [Tr. 102]. At her August 1999 appointment, she received an injection into the left carpal canal resulting in

immediate relief. [Tr. 103].

By late September 1999, the Plaintiff reported waking about three times per night in pain. [Tr. 105]. Although she was attempting to work, the more she used her arms, the worse the pain became. [Id.]. The physician recommended carpal tunnel release in order to prevent nerve damage. [Id.]. The procedure was performed on her left wrist on November 30, 1999. [Tr. 107]. The Plaintiff was not allowed to return to work until January 11, 2000. [Tr. 109]. She reported that the surgery had been successful in eliminating the pain in her left arm and requested to have surgery on her right arm. [Id.].

On February 11, 2000, the Plaintiff reported to her doctor that her job was causing pain in both arms. [Tr. 110]. Her physician opined that she was trying to do too much at work. [Id.]. He limited her to answering phones and five to ten minutes per hour of typing. [Id.]. In late March 2000, the Plaintiff reported that she had not worked for the past two weeks with the result of pain elimination. [Tr. 111]. Her physician returned her to work at "light duty as long as she is doing absolutely no data entry with either the left or the right hand." [Id.].

On June 2, 2000, the Plaintiff had a carpal tunnel release on her right arm. [Id.]. At follow up in July 2000, she reported no pain in either arm.

[Tr. 112]. Her physician released her to modified work beginning July 24, 2000 for four hours per day with no data entry or keyboarding. [Id.]. By the end of August 2000, the Plaintiff reported that the limited work day and modified tasks prevented pain. [Tr. 113].

In mid-September 2000, the Plaintiff was seen for an injury to her knee which she reported occurred on August 13, 2000 when she was playing kickball. [Id.]. She was released to work provided that she perform only limited data entry and typing. [Tr. 114]. By December 2000, the Plaintiff's arms were both much better and she reported that as long as she did not perform a lot of data entry, she had no pain. [Tr. 116]. She remained on light duty work status. [Id.].

By January 2001, the Plaintiff continued to improve and reported that Feldene alleviated her pain. [Id.]. She remained on light duty work status. [Id.]. In February 2001, a different drug was having positive results. [Tr. 117]. Her physician opined that it was unlikely she could ever return to repetitive data entry jobs. [Id.]. By the end of March 2001, she was still on light duty but her physician stated that carpal tunnel was "a minimal problem at this time." [Tr. 118]. In late April 2001, her physician wrote:

> I think the majority of her problem is a myofascial pain disorder
> and believe that her carpal tunnel findings are rather minimal and
> well controlled, as long as she can stay in her modified duty

restricted job on a permanent basis. ... [S]he has a residual 4% permanent partial impairment of the right hand and a 4% permanent partial impairment of the left hand as a result of her condition.

[Tr. 119].

In May 2001, her doctor opined that the Plaintiff had no sign of carpal tunnel syndrome and her pain must be related to myofascial pain disorder. [Tr. 120]. His only treatment suggestions were exercise and sleep. [Id.]. "I do not see any need for her to return for follow up" but if she did, he felt it would be due to myofascial pain, not carpal tunnel syndrome. [Id.]. In June 2001, the Plaintiff returned but again, her doctor opined that she did not have pain from carpal tunnel syndrome. [Id.].

In September 2001, the Plaintiff returned with pain, reporting that while she was on vacation, she was pain free. [Tr. 121]. In November 2001, she called her physician to report that she had seen a rheumatologist who reported she had fibromyalgia as well as myofascial pain. [Tr. 122]. In December 2001, the Plaintiff reported "that her condition has materially improved rather significantly since she was placed on Neurontin" by Dr. Nguyen at the Charlotte Institute of Rehabilitation. [Tr. 123]. Her orthopedic physician made a permanent referral to Dr. Nguyen as he had nothing more to add to her treatment. [Id.].

Dr. Nguyen reported in his treatment notes that the Plaintiff was very frustrated that no one would provide her with a diagnosis of repetitive motion disorder. [Tr. 135]. In December 2001, the Plaintiff reported "complete resolution of her pain when she is on Neurontin" but the medication left her sleepy during the day. [Tr. 139]. Dr. Nguyen advised her to reduce the level of medication. [Id.]. In April 2002, the Plaintiff reported that although the medication had completely eliminated her pain, she could not tolerate the side effects and had quit taking it. [Tr. 140]. "The patient truly feels that [the pain] is associated with her job, as every single time she takes a vacation her pain resolves. She also feels that it is secondary to repetitive motion that she performs at work. However, it must be noted that the patient has been on work limitations[.]" [Id.].

A second nerve conduction study performed in July 2002 revealed no problems. [Tr. 143]. A neurology work up in June 2002 was also normal. [Tr. 148]. She was referred to physical therapy which she reported in September 2002 was causing a 75% improvement. [Tr. 149]. She was referred for a functional capacity evaluation which revealed she could return to work in light duty status. [Tr. 151]. The Plaintiff's physician released her as he had "nothing further to offer and this is purely a pain management issue." [Id.].

After a course of physical therapy through the late summer and fall of 2002, a Work Capacity Evaluation Summary Report was prepared by the physical therapists involved in the Plaintiff's treatment. [Tr. 190]. They reported their test findings in combination with clinical observations. [Id.].

> [The Plaintiff] demonstrated the ability to safely lift 20 pounds from waist to shoulder level, 25 pounds from floor to waist level, and 20 pounds from floor to shoulder level on an occasional basis. She demonstrated the ability to safely lift 20 pounds from waist to shoulder level, 25 pounds from floor to waist level, and 20 pounds from floor to shoulder level on a frequent basis. She demonstrated the ability to carry 20 pounds for 80 feet, push with a sustained force of 21 pounds and pull with a sustained force of 20 pounds for 40 feet on an occasional basis. [The Plaintiff] demonstrated the ability to perform overhead work, reach forward, and perform fingering and grasping/handling activities on an occasional basis.[1] She demonstrated the ability to bend/stoop, and perform low level work on a frequent basis.

[Id.].

Through April 2003, the Plaintiff was followed through the Rehab Center. [Tr. 214]. She reported that the lidoderm patches worked, she was doing better and on that day was pain free. [Id.]. She reported, however, that "if she does anything at all with her hands, her pain returns." [Id.]. She was given a 7% disability rating for each hand. [Id.]. At the last visit in

---

[1]In the context of a residual functional capacity assessment, "occasionally" is defined as occurring from "very little up to one-third of an 8-hour workday (cumulative, not continuous)." [Tr. 87]. That is, not more than about two and a half hours cumulatively throughout an eight hour work day.

September 2003, her doctor released her from follow-up. [Tr. 216].

The Plaintiff received a physical residual functional capacity (RFC) assessment by state agency medical experts in August and December 2003. [Tr. 87-97]. The following were found: the Plaintiff was able to occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit, stand and walk about six hours out of an eight hour workday; push and pull unlimited; no postural limitations; limited handling and fingering frequently but not continuously;[2] no visual limitations; no communicative limitations; no environmental limitations; with a notation that the findings of the state agency experts did not significantly differ from treating sources. [Tr. 87-93]. "One TP [treating physician] rated 10% perm disability of both wrist/hands. Another gives functional capacity to return to light work. Our RFC is for light work." [Tr. 93]. It was also noted that she had reached maximum improvement in connection with carpal tunnel and had no limitations as a result of mild degenerative disc disease. [Tr. 94]. The report concluded with notations to jobs which the Plaintiff was able to perform. [Tr. 97].

In September 2004, the Plaintiff reported to her neurologist that when

_____

[2] "Frequently" is defined as occurring between one-third and up to two-thirds of an eight hour workday, but not continuously. [Tr. 87].

she uses the lidoderm patches, "she is able to use her arms and hands with activities such as cooking and doing her laundry." [Tr. 227]. In April 2005, another nerve conduction study was performed. [Tr. 230]. The physician noted that he was "at a loss to explain her ongoing symptoms with her normal nerve conduction studies." [Id.].

## THE ALJ'S DECISION

The ALJ, in applying the five step sequential evaluation process, first noted that the Plaintiff has not been engaged in substantial gainful activity since the alleged onset date of her disability. [Tr. 15]. After a thorough review of the Plaintiff's medical history, he concluded at the second step that she has repetitive motion disorder of her arms and hands and mild cervical degenerative disc disease, both of which are medically severe impairments. [Tr. 17]. At the third step, however, he found that these impairments, considered alone and in combination, did not meet or equal the level of severity listed in the Social Security regulations for a finding of disability. [Tr. 18]. Considering step four of the sequential evaluation process, the ALJ found that the Plaintiff could not return to her past relevant work as an administrative assistant. [Tr. 19]. He then proceeded to the final step to consider whether her residual functional capacity, age,

education and past work experience enable the performance of other work. [Tr. 18-20]. He considered both the opinions of the Plaintiff's treating physicians as well as the findings of state agency medical consultants and found all such opinions were consistent. [Id.]. He found that the Plaintiff was able to perform a limited range of light and sedentary jobs which would not require repetitive use of her hands for more than one half hour at the time. [Id.].

In the context of reaching his decision, the ALJ discussed the testimony of Kathleen Mooney, vocational expert, who testified during the Plaintiff's hearing. [Tr. 277-284]. In the hypothetical question which the ALJ posed to the expert, he first required that the expert consider the Plaintiff's age, education, and a limitation to sedentary work in a job without a demand for frequent use of hands or repetitive use of hands for more than one half hour before doing other tasks not involving such use. [Id.]. The expert testified that there would be no such jobs because sedentary work requires constant use of the hands. [Tr. 280]. The expert testified, however, that there do exist light jobs which would not require frequent or repetitive use of hands and identified the jobs of gate tender, a modified form of packaging and filler machine operator and some information clerk jobs provided there was not frequent use of hands. [Tr. 282-84]. Based on

the testimony of the vocational expert at the hearing, the ALJ found there were jobs which the Plaintiff could perform with her residual functional capacity. [Tr. 20]. As a result, he found she is not disabled.

In reaching his conclusion, the ALJ found that the Plaintiff's allegations of total disability were not credible in light of her verbal reports, daily activities, medical records, various evaluations and attendance at school. [Tr. 18]. "The claimant has been evaluated by numerous doctors who all agree that the claimant can perform light duty work that does not require repetitive hand and wrist movements." [Id.].

## DISCUSSION

The Plaintiff first argues that the ALJ made a conclusory assessment of her residual functional capacity without any citation to evidence or explanation for his reasoning. Specifically, she argues that the ALJ determined she could use her hands for up to one half hour at the time without citing any medical support or evidence. This, she claims, violates the directive of Social Security Regulation 96-8p, 1996 WL 374184, which requires the ALJ to conduct a function by function analysis in determining the individual's ability to perform work on a regular and continuing basis;

that is, eight hours a day, five days a week.[3]

Contrary to this rather general objection to the ALJ's decision, the ALJ made a thorough recitation of the Plaintiff's medical and health history. [Tr. 16-18]. In the context of the five-step evaluation sequence, he wrote:

> The undersigned must next determine the claimant's residual functional capacity, a term which describes the range of work activities that the claimant can perform despite her impairments.
>
> ...
>
> A Work Capacity Evaluation in December 2002 showed that the claimant demonstrated the ability to ... perform fingering and grasping/handling activities on an occasional basis. The claimant has been evaluated by numerous doctors who all agree that the claimant can perform light duty work that does not require repetitive wrist movements.[4]

[Tr. 18].

It is first noted that by referring to the Work Capacity Evaluation, the ALJ is also referring to the function by function analysis *contained within* that evaluation; that is, lifting and carrying, standing and walking, sitting, pushing and pulling, and postural, manipulative, visual, communicative, and environmental limitations. [Tr. 87-92]. "In light of SSR 96-8p, [the

---

[3] That regulation defines RFC as an assessment "of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis[; that is] 8 hours a day, for 5 days a week[.]"

[4] The Plaintiff refers to this evaluation as having been conducted by non-treating, non-examining physicians. The record, however, shows that this evaluation occurred after a period of physical therapy performed by the evaluating experts.

ALJ's] conclusion implicitly contained a finding that [the Plaintiff] physically is able to work an eight hour day," five days a week.  Hines, 453 F.3d at 563.

Moreover, in that Work Capacity Evaluation, the experts found the Plaintiff could perform grasping and fingering activities on an occasional basis.  The ALJ referred to the fact that the Plaintiff's treating physicians repeatedly returned her to light duty work which would entail fingering activities.  The Plaintiff testified at the hearing that she is able to perform fingering skills for up to thirty minutes at a time, at which point she needs to rest. [Tr. 258].  If she used a computer continuously for an hour to an hour and a half, the pain would recur. [Tr. 259].  If she were performing her old job of continuous fingering, she would experience pain after fifteen to twenty minutes. [Id.].  The RFC evaluation, the opinions of treating physicians  and the Plaintiff's own testimony support the ALJ's conclusion that she could perform fingering skills up to thirty minutes at the time.

Nonetheless, the ALJ also cited other evidence.  For example, the Plaintiff had been looking for work since January 2003, a fact which belied her claims of inability to use her hands at all. [Tr. 18].  She performed light housework and some cooking and had been attending school twelve hours per week during which time she took notes by hand. [Id.].

"To determine the claimant's RFC, the ALJ must consider the relevant medical evidence and other evidence of the claimant's condition in the record, including testimony from the claimant[.]"  Morgan v. Barnhart, 142 Fed.Appx. 716, 720 (4th Cir. 2005).   The ALJ's decision shows that he appropriately conducted his evaluation of the Plaintiff's residual fine and gross motor skill functioning as related to her hands and wrists.  Hines v. Barnhart, 453 F.3d at 562 ("RFC is a measurement of the most a claimant can do despite his limitations."); Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984) (the testimony of a non-examining physician may be relied on if it is consistent with that of treating physicians).

For these reasons the Plaintiff's first assignment of error is overruled. The decision of the ALJ, taken as a whole, includes all of what the Plaintiff claims to be absent.  As such, the ALJ complied with the requirements of Rule 96-8p.

The Plaintiff's next assignment of error is to the ALJ's conclusion that the Plaintiff's allegations of total disability due to pain were not credible. The basis of this objection is the ALJ's supposed failure to cite to the specific portions of the record on which he relied.   Plaintiff also argues that the ALJ failed to evaluate the Plaintiff's allegations of pain pursuant to Fourth Circuit precedent.

Contrary to the Plaintiff's argument, however, the ALJ's decision complies with relevant precedent regarding the evaluation of pain:

> Once an underlying physical or mental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (*i.e.*, manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

[Tr. 18]; see, *e.g.*, <u>Hines</u>, 453 F.3d at 564-64. Here, the ALJ found objective medical evidence of a condition reasonably likely to cause the pain alleged. [Tr. 18]. He then proceeded to the second step, the evaluation of the disabling effects of the Plaintiff's pain. In doing so, he considered both her subjective complaints and objective evidence.

> [The Fourth Circuit's standard for pain evaluation does] not [] say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, *they need not be accepted to the*

*extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.*

Hines, 453 F.3d at 465 n.3, *quoting* Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996) (emphasis provided).

Here, the ALJ made findings in accord with the requirements of Hines and Craig and, contrary to the Plaintiff's assertions, he cited evidence to support his conclusion. Specifically, he noted her RFC assessment, numerous opinions of treating physicians who believe she is able to perform light work; medication which eliminated pain; her wide range of daily activities and her ability to attend school. Moreover, in the earlier portion of his decision, the ALJ made findings that the Plaintiff took no pain medication and only used lidoderm patches about once or twice a month; she rarely used her splints; she had not seen a doctor for pain or otherwise pertaining to her wrists in over a year; she could perform daily life activities with some restrictions; she was attending school where she took notes; after physical therapy, an opinion was provided that she could return to light work; and she continued to look for a job. [Tr. 16-17]. The ALJ more than amply cited to the record in support of his conclusion regarding the credibility of the Plaintiff's allegations of pain.

Likewise, the ALJ followed Fourth Circuit precedent in evaluating those allegations of pain. He found objective medical evidence of the underlying condition, but he did not accept the Plaintiff's allegations of subjective pain to the extent that they were inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the Plaintiff alleged that she suffered.

In addition to the Plaintiff's assertion that the ALJ failed to cite to the record, it is unclear whether the Plaintiff also claims that the ALJ's credibility determination is unsupported by substantial evidence. The Plaintiff's brief in support of summary judgment contained mostly vague and general arguments making it difficult to ascertain her precise issues. In the interest of finality, however, it is noted that substantial evidence in the record clearly supports the ALJ's conclusion. Two months after her second carpal tunnel surgery, the Plaintiff injured her knee while playing kick ball, an activity inconsistent with allegations of constant pain related to that condition. [Tr. 113]. Her physicians thereafter opined repeatedly that carpal tunnel was no longer a problem for her and her pain, as alleged, must stem from a different problem. [Tr. 118-120]. One physician was exasperated with her claims that she was only pain free on vacation,

despite having been returned to modified work with restrictions which she also reported as reducing pain. [Tr. 123, 140]. She persisted in seeking a diagnosis of repetitive motion disease despite normal nerve conduction studies and neurology reports. [Tr. 135, 143, 148]. Her physician stated he was "at a loss" to explain her pain in view of normal tests. [Tr. 230]. Her daily activities, including the ability to attend school and take notes, did not support the intensity or degree of pain alleged. The Court concludes that the ALJ appropriately considered the issue of pain, using the correct legal standard, and that substantial evidence supports his credibility determination. Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994) ("an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility."); Mastro, 270 F.3d 171, 176 (the reviewing court does not make credibility determinations); Craig, 76 F.3d 585. For these reasons the Plaintiff's second assignment of error is overruled.

Plaintiff's third argument is that the ALJ failed to follow Social Security Ruling 00-4p, 2000 WL 1898704, in questioning the vocational expert. Ruling 00-4p provides that before relying on the testimony of a vocational expert to support a disability determination, an ALJ must identify

and obtain a reasonable explanation for any conflict between occupational

evidence presented by that expert and information contained in the

Dictionary of Occupational Titles (DOT) and explain in the decision how

any conflict has been resolved.

The Plaintiff argues that the vocational expert presented such a

conflict during her testimony concerning the job of packaging and filler

machine operator.  The vocational expert testified this job had a medium

classification in the DOT. [Tr. 281].  She went on to testify, however, that

she had expert occupational knowledge that many such jobs were found in

the manufacture of health and beauty aids. [Id.].  Those jobs, she testified,

required the worker to monitor automated equipment that packaged items

such as lip stick. [Id.].  The worker, she testified, "just ha[s] to start and

stop the machine and make sure it doesn't jam, call someone to fix it if it

does jam.  Those jobs are light and unskilled.  As I say, the closest DOT

code, though, would be 920685078 which is medium in the DOT, but the

numbers we are provided for light unskilled jobs are over 7200 in North

Carolina."  [Id.].

According to the Plaintiff, because the expert described a job that

had medium work requirements, the ALJ was required to clarify the

discrepancy and his failure to do so was error.  However, "[t]he DOT lists

maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A [vocational expert] may be able to provide more specific information about jobs or occupations than the DOT." SSR 00-4p. In fact, that is exactly what was done during the hearing. As such, there was no conflict between the vocational expert's testimony and the DOT; indeed, the expert took care to explain that there was no conflict because she was describing a particular job with different characteristics from the more demanding one described in the DOT.

The Plaintiff also claims that this job, packaging and filler machine operator, requires frequent reaching, constant handling and frequent fingering which are all precluded in her RFC. While it may be true that the DOT description for Job 920685078, packager, includes those requirements, the expert testified that the job listed in the DOT was simply the closest DOT description. It is similar to, but more physically demanding than, the job she was actually describing. The less demanding job the expert described was one the Plaintiff's RFC indicates she would be capable of doing. Harrington v. Astrue, 2008 WL 819035 (M.D.N.C. 2008) ("[T]he Fourth Circuit Court of Appeals has recognized V Es [vocational experts] as 'persons who have, through training and experience

in vocational counseling or placement, an up-to-date knowledge of job requirements, occupational characteristics and working conditions, and a familiarity with the personal attributes and skills necessary to function in various jobs.'"), *quoting* <u>Wilson v. Califano</u>, 617 F.2d 1050, 1053 (4th Cir. 1980); <u>Gump v. Commissioner of Social Security Admin</u>., 222 Fed.Appx. 553 **1 (9th Cir. 2007).

Regarding this same job, packaging and filler machine operator in the modified setting of the health and hygiene industry, Plaintiff also argues that the ALJ violated the requirements of Ruling 00-4p by failing to resolve a discrepancy in the vocational expert's testimony as to the degree of the use of hands required in this job. Plaintiff argues that

> the VE testifies that this particular job does not require use of the hands two-thirds of the time but when asked as to how much use of the hands it requires her response is "I don't recall that." If she does not recall how much use of the hands the job requires then how can it be certain that it is not two-thirds?

[Doc. 12 at 14]. The expert testified, however, that the use of hands in the specific job at issue was "light," [Tr. at 282-83], meaning less than one-third [Tr.87]. Plaintiff's argument simply ignores this testimony.

Plaintiff then argues that the vocational expert's testimony was rendered wholly unreliable because at the conclusion of the exchange regarding the use of hands in this job the expert testified about whether

force was required in such hand work, even though no question was asked about force. Her comment that hand use in this job also did not require the use of force may have been extraneous information, but it did not alter the fact that she testified concerning the amount of hand use associated with the job at issue. As noted above, "[t]he DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." SSR 00-4p. The fact that the expert described a particular job as it is performed in this specific setting did not alter the fact that she addressed that portion of the hypothetical question related to hand use.

The Plaintiff also makes a claim in a one sentence parenthetical that "(Plaintiff maintains her contention that the hypothetical question posed was improper.)" [Doc. 12 at 15]. Nothing more is provided to enlighten the Court as to the manner in which the hypothetical was improper. "Judges are not like pigs, hunting for truffles buried in briefs." Teague v. Bakker, 35 F.3d 978, 985 n.5 (4th Cir. 1994), cert. den. 513 U.S. 1153, 115 S.Ct. 1107, 130 L.Ed.2d 1073 (1995), quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991). This claim will therefore not be addressed further.

For all of these reasons the Plaintiff's second assignment of error consisting of these various assertions that the ALJ failed to comply with the

requirements of SSR 00-4p are overruled.

The Plaintiff's next assignment if error consists of a general and vague argument that the ALJ did not consider her impairments in combination. She does not specify in what manner the ALJ supposedly failed to do so. The ALJ's decision, as already noted, provided a thorough recitation of the Plaintiff's medical history, daily activities and reports of pain. Barnes v. Social Sec. Admin., 171 F.3d 1181, 1183 (8th Cir. 1999) (ALJ discussed the evidence of impairments and hypothetical question to the vocational expert included all impairments supported by the evidence). He considered the Plaintiff's degenerative disc disease and repetitive motion disorder in conjunction with her allegations of pain. [See, Tr. 18]; Varney v. Chater, 70 F.3d 113 (4th Cir. 1995); Hays v. Sullivan, 907 F.2d 1453, 1457 (4th Cir. 1990) (plaintiff was not receiving treatment for any of the combination of allegedly disabling impairments); Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (plaintiff not taking pain medication).

Finally, the Plaintiff makes another unsupported argument that the ALJ's decision "is based on his presumptions, speculations, and suppositions and it is completely without evidentiary support[.]" [Doc. 12 at 17]. As such, she argues that the decision is not supported by substantial evidence. As noted *infra*, the Court has reviewed the evidence and has

concluded that the ALJ's decision is supported by substantial evidence. For these reasons the Plaintiff's final assignment of error is overruled.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 11] is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 13] is hereby **GRANTED** and this action is dismissed with prejudice by Judgment simultaneously entered herewith.

Signed: August 27, 2008

Martin Reidinger
United States District Judge